Elizabeth R. MEYER, individually and on behalf of all others similarly situated, Plaintiff,

v.

The CITIZENS AND SOUTHERN NATIONAL BANK, Defendant.

Civ. A. No. 84–103–COL.

United States District Court, M.D. Georgia, Columbus Division.

Jan. 21, 1988.

C. Neal Pope of Pope, Kellogg, McGlamry, Kilpatrick & Morrison, Columbus, Ga., Richard H. Gill of Copeland, Franco, Screws & Gill, P.A., Montgomery, Ala., Joseph L. Waldrep of Hatcher, Stubbs, Land, Hollis & Rothschild, Columbus, Ga., and C. James Jessee, Jr., Atlanta, Ga., for plaintiff.

John T. Marshall of Powell Goldstein, Frazer & Murphy, Atlanta, Ga., and W.G. Scrantom, Jr. of Page Scrantom, Harris & Chapman, P.C., Columbus, Ga., for defendant.

## OPINION AND FINAL ORDER AND JUDGMENT APPROVING CLASS ACTION SETTLEMENT AND DISMISSING WITH PREJUDICE ALL CLAIMS AGAINST DEFENDANT

ELLIOTT, District Judge.

### I. FACTUAL BACKGROUND

This action was brought by Elizabeth R. Meyer, a citizen of the State of Florida, on behalf of herself and all others similarly situated, against The Citizens and Southern National Bank (the "Bank"), a citizen of Georgia, on June 25, 1984 as a Bill for Equitable Accounting and Declaratory Relief (the "Complaint"). The Complaint sought, among other things, an accounting from the Bank as Trustee of The Citizens and Southern Income Fund (the "Income Fund")[1], for certain losses sustained by the Income Fund, including income that should have been earned on lost principal as well as income lost through various alleged imprudent acts and omissions. The Income Fund is a common trust fund maintained by the Bank for the collective investment and reinvestment of monies held by the Bank in its capacity as trustee or co-trustee of individual trusts, estates, and other fiduciary accounts. The Income Fund was created on May 12, 1966, by the execution of a unilateral Declaration of Trust (referred to as the "Plan") entered into by the Bank as Trustee under appropriate provisions of federal law for common trust funds.

The Complaint also sought to recover attorneys' fees and expenses of litigation from the Bank. The Bank filed its Answer and defenses to the Complaint and denied all material allegations of the Complaint. In addition, the Bank set forth various special defenses and a counterclaim.

---

1. The Citizens and Southern Income Fund has formerly been known as The Citizens and Southern National Bank Income Fund, and the Fixed Income Fund of The Citizens and Southern National Bank.

This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332 and venue is proper.

On December 5, 1984, plaintiff Meyer moved for class certification seeking to have certified a class of beneficiaries whose personal trusts had purchased units in the Bank's Income Fund from the inception of the Income Fund in 1966 until the filing of this suit in 1984. The Bank vigorously contested class certification. On March 7, 1985, after extensive briefing and oral argument by both sides, this Court rendered its opinion certifying this action as a class action under Rules 23(b)(1)(A), 23(b)(1)(B) and/or 23(b)(2), Fed.R.Civ.P., and defined the class as the beneficiaries of those trusts holding participating units in the Income Fund since the Fund's inception on May 12, 1966 through the commencement of this action.[2] The Court further recognized plaintiff Meyer as an appropriate class representative. The determination of the class action certification was, as provided in Rule 23, Fed.R.Civ.P., interlocutory in nature until the final resolution of this cause. Based on three years of discovery proceedings and evidence adduced during three weeks of trial, the Court hereby reaffirms the class certification. Accordingly, the findings supporting class certification as set out in the opinion and order entered March 7, 1985, are incorporated herein and made a part of this final judgment.

Since the filing of this suit, there has been extensive discovery conducted by both parties. Plaintiff has served, and defendant has responded to, numerous interrogatories and requests for production. Defendant has served, and plaintiff has responded to, numerous interrogatories and requests for production. Plaintiff has also served numerous requests for admissions on defendant.

During the course of discovery there have been numerous disputes regarding the assertion of various privileges by the Bank. At various times both parties filed motions to compel and this Court has held hearings on those motions. On two occasions the Court was called on to conduct an *in camera* inspection of documents to determine whether the Bank was required to produce those documents in response to discovery requests served by plaintiff.

During the course of discovery and trial preparation plaintiff's attorneys took numerous depositions and her attorneys, accountants, and other experts reviewed and analyzed between 150,000 and 200,000 documents and records produced by the Bank. Plaintiff engaged numerous experts, including a firm of certified public accountants, to assist in analyzing the investment and management activities of the Bank as Trustee of the Income Fund. From the testimony and evidence produced during the three weeks of trial it is obvious that this analysis was thorough, sifting, and time consuming and was conducted at considerable expense to the plaintiff.

On July 6, 1987, the trial of this case commenced before the Court, sitting without a jury. At the end of three weeks of trial the parties presented a proposed outline of settlement to the Court which was set forth in a letter agreement between counsel for the parties. The settlement came after the plaintiff had rested her case in chief and during the presentation of defendant's evidence. During the three weeks of trial a total of 37 witnesses testified either live or by deposition and hundreds of pages of documentary evidence were admitted into evidence. On July 31, 1987, two additional depositions and portions of three others were tendered into evidence by the Bank. In addition to the fact witnesses who testified, both parties offered the testimony of a number of expert witnesses. The subject matters on which these expert witnesses testified included trust administration, real estate, bonds, real estate investment trusts (REITs), matters concerning the Office of the Comptroller of the Currency (the "O.C. C."), and the computation of damages.

The letter agreement containing the proposed outline of the settlement was the result of extensive negotiation between

---

**2.** See *Meyer v. The Citizens and Southern National Bank,* 106 F.R.D. 356 (M.D.Ga.1985).

counsel for the parties. The proposed settlement was presented in open court and is a part of the record in this case. The Court, having heard three weeks of trial testimony and having seen the voluminous documentary evidence admitted in this case, gave preliminary approval to the proposed settlement. The Court then ordered the parties to proceed to adopt a formal settlement agreement and procedure, to ascertain the settlement shares of the various participating trusts which owned units in the Income Fund during the class period, to prepare a plan and schedule for distribution of the settlement proceeds, and to deposit the settlement proceeds into escrow pending a final hearing to determine the fairness and adequacy of the proposed settlement. The Court also appointed a guardian ad litem, Lee R. Redmond, Jr., Esquire, to represent the interests of unborn, unknown, incompetent, and minor members of the plaintiff class. Mr. Hasbrouck Haynes, a certified public accountant, was appointed by the Court as class accountant to determine that the method of allocating the settlement proceeds was fair, accurate, and impartial to all class members.

Pursuant to the above, the parties have done the following, all of which are reflected by documents filed in this case:

(1) Entered into a comprehensive settlement agreement dated December 2, 1987 (the "Settlement Agreement");

(2) Paid into escrow the settlement proceeds along with expenses and attorneys' fees pursuant to an escrow agreement;

(3) Calculated the shares of principal, income, and interest to be distributed to the various participating trusts;

(4) Formulated and adopted an initial plan of distribution of the shares of principal, income and interest to the various participating trusts (the "Plan of Distribution"); and

(5) Given formal notice to class members pursuant to and in accordance with the Court's previous order.

On December 30, 1987, following the giving of notice to all class members, a Fairness Hearing[3] was held for the purposes of ascertaining that proper and adequate notice of the settlement had been given to class members, hearing objections to the proposed settlement, and determining whether the settlement is fair, adequate, and reasonable and should be approved by the Court.

## II. STANDARDS FOR APPROVAL OF A CLASS ACTION SETTLEMENT

■ In deciding whether to approve the settlement of this class action, this Court is guided by established principles set by the appellate courts for the Fifth and Eleventh Circuits. *Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir.1984); *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982); *Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977); and *Miller v. Republic National Life Insurance Company*, 559 F.2d 426 (5th Cir.1977). In order to approve the settlement the Court must determine that the settlement is fair, adequate, and reasonable and that there has been no fraud or collusion between the parties in reaching the settlement. *Bennett v. Behring Corp.*, *supra; Ruiz v. McKaskle*, 724 F.2d 1149 (5th Cir.1984); and *Cotton v. Hinton*, *supra.*

In applying the established principles to the present case the Court is mindful that each case must be decided on its own facts and that the Court's task is to essentially balance the applicable principles. *Cotton*, 559 F.2d at 1330. The Court is also aware that there is a strong judicial policy favoring settlement, *Bennett*, 737 F.2d at 986, and that "[p]articularly in class action suits, there is an overriding public interest in favor of settlements." *Cotton*, 559 F.2d at 1331. "It is often said that litigants

---

**3.** As used in this opinion, the terms Fairness Hearing and Settlement Hearing are used interchangeably.

should be encouraged to determine their respective rights between themselves." *Id.* at 1330–31.

■ In considering whether this settlement is fair, adequate, and reasonable, the Court should address the following factors:

(1) The likelihood of success at trial and range of potential recovery;

(2) The terms of the settlement;

(3) The complexity, expense, and duration of litigation;

(4) The procedures afforded to notify the class members of the proposed settlement and to allow them to present their views;

(5) The judgment of experienced counsel;

(6) The substance and the amount of opposition to the settlement; and

(7) The stage of the proceedings at which the settlement was achieved.

*In re Corrugated Container Antitrust Litigation,* 643 F.2d 195; *Bennett v. Behring Corp., supra; Ruiz v. McKaskle, supra; Miller v. Republic National Life, supra; Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157 (5th Cir.1978); *Cotton v. Hinton, supra; Holmes v. Continental Can Co.,* 706 F.2d 1144 (11th Cir. 1983); and *In re Dennis Greenman Securities Litigation,* 622 F.Supp. 1430 (D.C. Fla.1985), *rev'd on other grounds,* 829 F.2d 1539 (11th Cir.1987).

■ In considering the foregoing factors, an important function of a district court is its consideration of the settlement terms is a comparison of those terms with the likely rewards the class would have received following a successful trial. *In re Corrugated Container Antitrust Litigation,* 643 F.2d at 212. In this regard, "[t]he relief sought in the [C]omplaint may be helpful to establish a benchmark by which to compare the settlement terms." *Cotton,* 559 F.2d at 1330.

After considering the above principles and factors, the Court concludes for the reasons which are set out below that the settlement was reached without any fraud or collusion, and that it is fair, adequate, and reasonable, and should be approved.

### A. *Absence of Collusion.*

■ There is absolutely no evidence in the record before the Court, nor has anyone suggested, that there has been any fraud or collusion among the parties or their attorneys in arriving at the terms of the settlement. On the contrary, as the Court has previously noted, this case has been extremely hard fought from the very beginning and the Court has often observed the vigor with which the attorneys have advanced the interests of their respective parties. Furthermore, this Court is acquainted with counsel for both parties and knows them to be of the highest integrity.

Therefore, the Court finds that the settlement was negotiated at arms-length and without any fraud or collusion.

### B. *Fairness, Adequacy, and Reasonableness.*

The factors which the Court should consider in deciding whether the settlement is fair, adequate, and reasonable have been enumerated above and the Court will now address each of those factors.

#### 1. Likelihood of Success at Trial and Range of Potential Recovery.

■ In determining plaintiff's likelihood of recovery, there is a threshold requirement that the Court undertake an analysis of the facts and law relevant to the proposed compromise. *Cotton,* 559 F.2d at 1330. It is not the Court's role, however, to try the merits of the case in the settlement hearings. *Id.; In re Corrugated Container Antitrust Litigation,* 643 F.2d at 212. The trial court does not have a duty, or even the right, to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute. *Cotton,* 559 F.2d at 1330. Furthermore, a district court is not required to establish the plaintiff's likelihood of prevailing to a certainty. *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1322, 1327 (5th Cir.1981).

The Plaintiff's Complaint sought recovery based on two theories or causes of action. Plaintiff's first cause of action al-

leged that the Bank as Trustee of the Income Fund breached its fiduciary duties under the laws of the State of Georgia. Plaintiff's second cause of action alleged that the Bank was liable to plaintiff for allegedly violating regulations promulgated by the O.C.C., specifically, Regulation 9, 12 C.F.R. §§ 9.1–9.22. Regulation 9 governs a national bank acting in a fiduciary capacity, including a bank which is trustee of a common trust fund.

In considering plaintiff's likelihood of recovery at trial it must first be observed that plaintiff faced serious hurdles in prevailing on a cause of action based on alleged violations of Regulation 9. The authority in this Circuit would seem to undercut plaintiff's standing to pursue a private federal right of action based on violations of Regulation 9. *Blaney v. Florida National Bank*, 357 F.2d 27 (5th Cir.1966). It would appear, therefore, that plaintiff's likelihood of prevailing on her second cause of action is relatively low.

Plaintiff's first cause of action seeks to recover for losses resulting from alleged breaches of the Bank's fiduciary duty under the laws of Georgia. It is undisputed in this case that the Income Fund suffered losses. That fact alone, however, does not entitle plaintiff to recover, because a trustee is not a guarantor of the investments it makes. *Stark v. United States Trust Company of New York*, 445 F.Supp. 670, 678 (S.D.N.Y.1978); *McCabe v. Fowler*, 84 N.Y. 314 (1881). Proof of loss or depreciation does not establish a prima facie case of negligence or imprudence. *Matter of Watson*, 168 Misc. 135, 140, 5 N.Y.S.2d 416, 422 (Surr.Ct. Oneida Co.1938). The fact that losses were suffered does not prohibit a court from approving the actions of a trustee. *Lazzarone v. Bank of America*, 181 Cal.App.3d 581, 226 Cal.Rptr. 855 (1986). In order to recover for losses suffered by the Income Fund plaintiff had the burden of proving that the Bank breached its fiduciary duty as trustee, *Clayton v. First National Bank of Atlanta*, 237 Ga. 604, 229 S.E.2d 346 (1976); *Grey v. First National Bank in Dallas*, 393 F.2d 371 (5th Cir.1968), and that any losses which plaintiff and the plaintiff class suffered were proximately caused by the Bank's breaches of its fiduciary duty. *U.S. Life Insurance v. Mechanics & Farmers Bank*, 685 F.2d 887 (4th Cir.1982); *Matter of McCafferty*, 147 Misc. 179, 264 N.Y.S. 38 (Surr.Ct. King Co. 1933); and Bogert, *Trusts and Trustees* § 701, p. 199 (2d rev. ed. 1982).

In addition, when judging a trustee's investment decisions, those decisions must be judged according to the circumstances at the time the trustee acts and not by hindsight. *Stark*, 445 F.Supp. 670, 678; *Brown v. Wright*, 39 Ga. 96 (1868). Given the time period at issue in this case, 1966 to 1984, the great number of investments involved, the thousands of discretionary decisions made by the Bank as Trustee of the Income Fund, and the severe economic events that occurred and the unprecedented interest rates that prevailed during the time period at issue, plaintiff's path to recovery was by no means without obstacles.

The investments challenged by plaintiff can be grouped into three categories: (1) real estate, (2) bonds, and (3) REITs. Looking first at the real estate investments, plaintiff maintained and sought to prove at trial that certain real estate investments were risky, speculative, and imprudent. These allegations were hotly contested by the Bank. The Bank offered evidence that each real estate investment criticized by plaintiff was neither risky nor speculative and that each investment was prudent at the time it was made and appropriate for the Income Fund. Plaintiff also alleged that the Bank, as Trustee of the Income Fund, had conflicts of interest regarding some of the real estate investments. The Bank, through its witnesses, also vehemently denied that it was guilty of any conflicts of interest and adamantly maintained that it always acted in the best interests of the Income Fund and its participants and that it complied with all applicable O.C.C. regulations, seeking clarification from the O.C.C. in appropriate instances.

With respect to the bond investments, plaintiff alleged and sought to prove that the Bank as Trustee of the Income Fund made imprudent investments, either by purchasing bonds which should not have

been purchased or by buying and selling bonds which were otherwise appropriate for investment but which were purchased or sold at the wrong time. The Bank responded to these allegations by offering evidence that the large majority of bonds purchased for the Income Fund were investment grade bonds. In the isolated instances when a bond was not rated or was not rated investment grade, the Bank sought to prove there was an analysis made by employees of the Bank on a bond-by-bond basis which indicated that the bond was a prudent investment at the time it was purchased. The Bank also offered evidence that there were valid and justifiable reasons supporting each purchase or sale of a bond in the Income Fund.

Concerning REITs, plaintiff sought to prove at trial that these investments were purchased in the early 1970's, at a time when they were new ventures with little or no operating history, that the REITS were risky investments, and, therefore, they were not proper investments for the Income Fund. The Bank offered evidence that the REITs were sponsored by entities with established track records in investing in real estate and real estate related investments. The Bank argued that the REITs employed individuals who were knowledgeable and experienced in the investment activities undertaken by the REITs.

For each of the investment areas challenged by plaintiff, both plaintiff and defendant offered extensive evidence, in the form of documentary evidence and through the testimony of fact and expert witnesses, that their respective allegations or responses were correct and should be adopted by the Court. Had this case been tried to its conclusion, it would have been the Court's duty to resolve all of the conflicts in the evidence and determine who should prevail in this litigation, either wholly or in part. Because the parties have now settled this dispute, subject to the Court's approval, the Court is not required, nor does it even have the right, to resolve the many issues,

both factual and legal, involved in this case. *Cotton,* 559 F.2d at 1330. The Court's role is to balance the conflicting positions of the parties and determine a range of recovery, if any, that plaintiff might have obtained if the trial had been completed.[4]

In considering the range of recovery, the Court notes at the outset that issues of fact were raised by the evidence which would have allowed the Court to resolve this case in favor of the Bank and against the plaintiff and plaintiff class. Had this occurred, plaintiff's recovery would have been zero. On the other hand, plaintiff sought to prove that the class was entitled to recover a total of approximately $73,000,000 for all lost principal, lost income, and interest on the lost principal and income. It would appear, therefore, that the highest recovery plaintiff might have obtained under the best case for plaintiff would have been $73,000,000.

It is significant and the Court notes that of the total $73,000,000 sought by plaintiff, approximately $41,000,000 was comprised of interest which plaintiff sought to recover on lost principal and income. The plaintiff used the interest rate for six-month certificates of deposit to compute this $41,000,000 in lost interest. The Bank contended that should any interest be awarded, it should be calculated pursuant to O.C.G.A. § 53–13–28. This statute provides for interest at the rate of 7% simple interest for a period of six years and then interest at a rate of 6% compounded annually thereafter. When consideration is given to the extremely high level that interest rates reached during the period 1979 to 1982, it is obvious that the statutory rate of interest would have produced significantly less interest than the method used by plaintiff. Had the trial been completed, the Court would have been required to resolve this question of which interest rate to use. Because the parties have agreed to a settlement, the Court is not required to resolve this issue.[5]

---

**4.** The Court will deal further with plaintiff's likelihood of recovery when it compares the

terms of the settlement with the possible outcome at trial in the next portion of this opinion.

**5.** The Court notes that one benefit of the settle-

### 2. Terms of the Settlement.

■ The Court will now address the terms of the settlement and compare them to the result which might have been obtained if this case had been tried to completion.

The total settlement amount is comprised of three components: (1) $25,000,000 to the plaintiff class; (2) $625,000 to counsel for the plaintiff class as partial reimbursement for expenses incurred on behalf of the plaintiff class; and (3) $7,000,000 paid directly to counsel for the plaintiff class as attorneys' fees. While the $7,000,000 is not technically being paid to the plaintiff class, the Court believes it is appropriate to include this figure as a part of the total settlement. If this amount had not been included in the total settlement, then plaintiff's attorneys would have been entitled to seek this amount from the fund of $25,000,000 and this would have reduced the total recovery to the plaintiff class.

The $25,000,000 and the $625,000 were deposited in an escrow account on October 1, 1987 and invested in two certificates of deposit earning 7.3% interest and maturing on February 1, 1988. At that time, if the funds are not ready to be disbursed, they will be reinvested by Columbus Bank and Trust Company, the escrow agent. This aspect of the settlement obviously benefits the class members should there be any delay in paying out the proceeds. The interest will be used to pay additional expenses of plaintiff's attorneys above the $625,000, the expenses and fees of the guardian ad litem, Mr. Redmond, and the fees and expenses of the class accountant, Mr. Haynes. After the foregoing expenses have been paid, any additional interest accrued on the $25,000,000 and the $625,000 will be paid to the members of the plaintiff class.[6]

The $25,000,000 was arrived at by the attorneys for both parties selecting nineteen (19) investments held by the Income Fund during the period from 1966 through 1984 (the "Settlement Securities"). The nineteen Settlement Securities represent the three areas of investments challenged by plaintiff and are comprised of eight real estate investments, five investments in REIT shares, and six investments in bonds and debentures. The lost principal and income which were attributed to these Settlement Securities total $11,131,677. Taking the lost principal and income, $11,131,677, together with the interest on those losses resulted in a total recovery of $25,000,000 to the plaintiff class.

At the Fairness Hearing Edwin Landon Crane testified by affidavit about the method used to calculate the interest on the lost principal and income and about the method used to allocate and distribute the settlement proceeds. Mr. Crane is a certified public accountant and a partner in the accounting firm of Jackson, Thornton & Company, Montgomery, Alabama. He has practiced accounting since he was certified as a public accountant by the Alabama State Board of Public Accountancy in 1963. Mr. Crane was retained by the Bank to assist it in devising a plan by which to allocate the $25,000,000 settlement proceeds.

Mr. Crane had previously been retained by First Alabama Bank of Montgomery, N.A. to assist that bank in devising a plan of allocation of monies awarded to a plaintiff class against that Bank in an action styled *Charlotte K. Martin and Kathleen Gerson, et al. v. First Alabama Bank of Montgomery, N.A.*, in the Circuit Court of Montgomery County, Alabama, Case No. CV-78-1491. The *Martin* action was a class action brought against the First Alabama Bank of Montgomery, N.A. as trustee of two common trust funds.

Mr. Crane's testimony can be summarized as follows. A settlement method-

---

ment to the plaintiff class is that a compromise interest rate was agreed to by the parties in determining the interest allocation of the settlement.

**6.** The interest earned on the settlement proceeds while invested in the escrow account will be allocated to each trust on a pro rata basis in the same proportion that each individual trust's allocation or share of the settlement proceeds bears to the total settlement proceeds of $25,000,000.

ology was developed to calculate the loss of principal and income suffered by each individual trust resulting from the market performance of the Settlement Securities. A data base was accumulated to include the following necessary facts: (1) The total number of Income Fund units outstanding for each monthly valuation period during the class period; (2) The Income Fund units owned by each trust for each valuation period during the class period; (3) The market depreciation or appreciation for each Settlement Security for each valuation period during the class period using the same valuation methods as used by the Income Fund; (4) The loss of income from each real estate Settlement Security for each monthly valuation period during the class period; (5) The month in which each Settlement Security was purchased and sold; and (6) The six-month certificate of deposit rate for each month in the class period. This rate was restated to an equivalent monthly rate.

A model "settlement fund" was created which held only the Settlement Securities. The time period for the model fund began from the date of the first purchase of a Settlement Security (October 13, 1970) to the date of the last sale of a Settlement Security (June 9, 1982). For the purpose of interest accrual, the period continued through September 30, 1987. (This model fund is hereinafter referred to as the "Settlement Fund.").

The individual trusts which held units of the Income Fund for each valuation period during the time period of the Settlement Fund were then identified. These individual trusts became the unit holders of the Settlement Fund for each valuation period of the Settlement Fund.

Accounts were established for each individual trust holding units in the Settlement Fund to reflect that trust's share of the $25,000,000 settlement proceeds which were allocated to principal loss (the "Principal Settlement Account") and that trust's share of the $25,000,000 settlement proceeds which were allocated to income loss (the "Income Settlement Account").

The settlement methodology recognized that Settlement Securities could decline in value without an interruption of the income flow from the investment. This recognition resulted in the use of separate Unrealized Loss/Gain accounts for each trust's share of each Settlement Security's market loss or gain. The total market loss/gain for each Settlement Security for each period was allocated to each trust's Unrealized Loss/Gain account for that security based upon the units owned by each trust as a fraction of total units owned by all trusts. Amounts were later transferred from the separate Unrealized Loss/Gain accounts when either that Settlement Security was sold by the Income Fund or when the trust sold all or a fraction of its Income Fund units. All of the unrealized loss/gain was transferred to the realized Principal Settlement Account if the Income Fund sold the Settlement Security or if a trust sold all of its units. If a trust sold a portion of its units, the resulting percentage of each unrealized amount for that trust was transferred to the realized Principal Settlement Account. The loss of income (or occasionally an income gain) was allocated to each trust's Income Settlement Account for each monthly period based upon the ratio of units owned by each trust to the total units owned by all trusts.

Two Settlement Securities were isolated into a liquidating account of the Income Fund in November of 1975. Because all subsequent principal losses and income losses from these two securities were ultimately borne by the holders of units in the Income Fund for the valuation period ending November, 1975, all subsequent principal losses and income losses for these two Settlement Securities in the Settlement Fund were allocated to the individual trusts which held units in the Settlement Fund for November, 1975.

After all principal losses/gains and income losses/gains for all Settlement Securities for all valuation periods were allocated to the individual trusts, it was determined that some trusts had either suffered no losses or had realized gains from the market performance of the Settlement Securities. These conditions were caused by

either the trust not having owned units in the Income Fund during the time period in which the Income Fund held any of the Settlement Securities or the trust holding units during a period of market appreciation and selling the units at a higher unit price. According to the initial Plan of Distribution, of the 3,327 individual trusts which held units in the Settlement Fund, 3,035 trusts participated in the distribution of the settlement proceeds, 103 did not own units in the Income Fund during the time period in which the Income Fund held any of the Settlement Securities and 189 trusts sold their units at a time when the Settlement Securities had appreciated in value and as a result realized a gain. Since the trusts in the latter two categories did not lose either principal or income because of the Income Fund's ownership of the Settlement Securities, they did not participate in the distribution of the settlement proceeds.

That portion of the settlement proceeds which was not allocated to principal loss and income loss was allocated as interest on each trust's respective Principal Settlement Account and Income Settlement Account, using a compromise interest rate which paralleled the monthly equivalent of the historical six-month certificate of deposit rate in effect for each valuation period as shown by the Federal Reserve Bulletin. The application of this interest rate to the loss of income and the loss of principal produced a total allocation of $25,000,000 among those trusts suffering principal and/or income losses from the market performance of the Settlement Securities owned by the Settlement Fund.

If the Principal Settlement Account, the Income Settlement Account, and the interest on those accounts for a particular trust are added together, it will produce that trust's allocable share of the settlement proceeds.[7]

The following records which were filed with the Court document the settlement allocation: (1) Master File Listing—A data base listing the total units outstanding for each period, the number of outstanding units identified as units held by principal gain trusts for principal allocation purposes and income gain trusts for income allocation purposes, the principal loss/gain and the income loss for each Settlement Security for each period, the month in which each Settlement Security was sold, and the monthly equivalent of the historical six-month certificate of deposit rate for that period; (2) Plan of Distribution—A detailed record by valuation period of each trust's Principal Settlement Account and Income Settlement Account and the accumulation of interest on the Principal Settlement Account and interest on the Income Settlement Account; (3) Settlement Summary—A recapitulation of each trust's settlement totals; and (4) Master Settlement Summary—A listing of the settlement totals for all individual trusts.

In addition to Mr. Crane, Mr. Hasbrouck Haynes testified regarding the method of allocating the $25,000,000 settlement proceeds. Mr. Haynes is a certified public accountant of many years experience and is a partner in the accounting firm of H.L. Raburn & Company of Birmingham, Alabama. As already discussed, Mr. Haynes was appointed by the Court to serve as the accountant representing the plaintiff class and to determine that the method of allocating the settlement proceeds was fair, accurate, and impartial to all class members. Mr. Haynes earlier had been retained by plaintiff's counsel as an expert accountant and, as such, had reviewed thousands of the documents produced by the Bank in this action and had testified at trial. Mr. Haynes testified at the Fairness Hearing about his role in developing the method of allocation and the audits he performed to insure that the method of allocation was in fact fair, accurate, and impartial. Mr. Haynes testified that he was satisfied that the allocation of the settlement proceeds was in fact fair, accurate, and impartial to all class members.

---

7. The interest referred to here is the interest through September 30, 1987. The interest accruing on the settlement proceeds after they were deposited into the escrow account on October 1, 1987, will be allocated as discussed earlier in this opinion.

Having discussed plaintiff's likelihood of recovery had the trial gone to completion, the range of possible recovery, and the terms of the settlement, the Court will now compare these factors. It is important to note that when comparing the terms of the settlement with the possible recovery at trial, "the [C]ourt is not confined to [a] mechanistic process of comparing the settlement to the estimated recovery times a multiplier derived from the likelihood of prevailing on the merits." *In re Corrugated Container Antitrust Litigation*, 643 F.2d at 217.

Based on all of the evidence that the Court heard during the trial of this case plus the entire record and history of this case from its beginning to the present, the Court finds that the Settlement Securities represent those investments which were most contested by the parties in this action. Although plaintiff challenged investments in addition to the Settlement Securities, the likelihood of recovery on those investments was uncertain and the plaintiff class had no guarantee that it could have recovered any amount for these investments if the case had been completely tried. It must be remembered that "compromise is the essence of a settlement ... [and] inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Cotton*, 559 F.2d at 1330. Furthermore, "[a] just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litigation*, 659 F.2d at 1325.

Based on the foregoing, the Court is of the opinion that the settlement of this case is within the possible range of recovery, if any, and is of such an amount as to be at a point in that range which is fair, adequate, and reasonable, if the plaintiff is entitled to recovery at all.

### 3. Complexity, Expense, and Duration of Litigation.

■ Another factor the Court is to consider in deciding whether to approve the settlement is the complexity of the case and the expense and duration of the case if the settlement is not approved. This case is very complex both from a factual and legal standpoint. The factual complexity stems from the fact that the time period involved in this case exceeds eighteen (18) years, that it was necessary for plaintiff's counsel to review and analyze between 150,000 and 200,000 documents, that approximately forty-eight depositions were taken by the parties (some lasting for more than one day), that the plaintiff was challenging hundreds of investments made by the Bank as Trustee of the Income Fund, that the class which was certified in this case was comprised of 3,327 trusts and other fiduciary accounts, and that the notice which was given to the class members in this case was mailed to approximately 8,660 class members.

The complexity of the legal issues in this case is evidenced by the trial briefs filed by plaintiff and defendant, which together total over 100 pages. These briefs clearly enumerate the many legal issues involved in this case and the Court will not list them here again. Furthermore, counsel for plaintiff have devoted over 10,000 man-hours to this case since it was filed.

The expense involved in this case is well documented by the records submitted by plaintiff's counsel. The expenses incurred on behalf of the plaintiff class exceed $750,000. Although the Court does not have before it the expenses incurred by the Bank in defending this action, the Court is sure that these expenses must be great.

As to the duration of the litigation, this case has already had an active life of three and one-half years. The trial had already lasted three weeks before the settlement was reached and could have easily taken another two weeks or longer to complete. Given the vigor with which this case had been fought by both parties, the Court has little doubt that if this case had not been settled at this point, that the prospects were good that it would have continued for years.

All of these facts suggest that the best interests of the class members are served by approving the settlement and allowing the class members to obtain the settlement proceeds at this time rather than defer any recovery for some indefinite and protracted

period. This is particularly true since the class members have no guarantee that the likelihood of any recovery or the amount of any recovery would be substantially improved or increased by continuing to pursue this case.

4. The Procedures Afforded to Notify the Class Members of the Proposed Settlement and to Allow Them to Present Their Views.

■ On November 9, 1987, the Court reviewed and approved the notice which was mailed to 8,660 members of the class. Larry B. Hooks testified by affidavit at the Fairness Hearing regarding the notice that was given to all class members regarding the proposed settlement and the Fairness Hearing. Mr. Hooks is Senior Vice President–Trust of the Bank and has been employed with the Bank since 1969. He supervises the administration of all personal trust accounts managed by the Bank in Georgia and was responsible for supervising and directing the giving of notice to the class members.

Mr. Hooks' testimony may be summarized as follows. At his direction, the trust officers in the various cities and offices of the Bank in Georgia reviewed the files of all 3,327 trusts, estates, employee benefit plans, and other fiduciary accounts of which the Bank was a fiduciary or co-fiduciary and which held participating units in the Income Fund at any time during the period from May 12, 1966 to June 25, 1984 (the "Fiduciary Accounts") in order to prepare a master list of the names and addresses of all individuals and entities to whom notice would be sent in accordance with the Method of Giving Notice.[8]

A true and correct copy of the Notice of Class Certification, Proposed Settlement and Settlement Hearing (the "Individual Notice") which was approved by the Court on November 9, 1987, was mailed on November 16, 1987 to all class members on the master list. The total number of Individual Notices mailed was 8,660.

A settlement summary (the "Settlement Summary") for each Fiduciary Account was included with each Individual Notice which was mailed on November 16, 1987. The Settlement Summary set forth the approximate amount of settlement proceeds that the Fiduciary Account of which the class member receiving the Individual Notice is or was a beneficiary will receive if the settlement is approved by the Court. The Individual Notice explained that the final amount that an individual class member will receive depends on certain factors that were set forth at pages 7 and 8 of the Individual Notice.

As of December 29, 1987, 390 Individual Notices were not delivered as originally addressed and were returned to the Bank by the United States Postal Service. The 390 returned Individual Notices represent only 4.5% of the 8,660 Individual Notices mailed to individual class members. Efforts were made to effect delivery of any returned notices, and a substantial number of returned notices were ultimately delivered.

Individual Notice was given to all members of the plaintiff class who are charitable beneficiaries of Fiduciary Accounts by adding the Attorney General for the State of Georgia (the "Attorney General") as a party to this action pursuant to O.C.G.A. § 53–12–79 and by serving the Attorney General with a Notice of Class Certification, Proposed Settlement and Settlement Hearing. Pursuant to the Method of Giving Notice, Individual Notice was given to all members of the plaintiff class who are named (specified) charitable beneficiaries of Fiduciary Accounts. In those instances where charitable beneficiaries were not specified by the relevant fiduciary instruments, Individual Notices were served on the Attorney General.

The Attorney General has filed his response with the Court and states that he has no objection to the proposed settlement of this action provided evidence is present-

---

8. The Method of Giving Notice outlines the beneficiaries of the Fiduciary Accounts to whom notice would be given and deals with other aspects of the notice which was given to the class members in this action. The Method of Giving Notice was approved by the Court on November 9, 1987.

ed which is acceptable to the Court and sufficient to establish that the proposed settlement is fair, adequate, reasonable and in the best interests of the plaintiff class.

Individual Notice was also given to the guardian ad litem, Lee R. Redmond, Jr., who represents the interests of unborn, unknown, incompetent and minor members of the plaintiff class. Where a member of the plaintiff class is represented by a legal guardian other than Mr. Redmond and the Bank was aware of such representation, Individual Notice was sent to that guardian.

Mr. Redmond was present at the Fairness Hearing. He recounted his actions in reviewing the record in this case, his involvement in the preparation of the Settlement Agreement, and his efforts to monitor the notice which was given to the class members of the settlement and the Fairness Hearing. Mr. Redmond found that adequate notice was given to all class members and he recommended that the Court approve the settlement as fair, adequate, and reasonable.

In addition to the 8,660 Individual Notices which were mailed, the Summary Notice of Class Certification, Proposed Settlement and Settlement Hearing which was approved by the Court on November 9, 1987 (the "Summary Notice") was published in twelve (12) major newspapers in Georgia and in the Wall Street Journal. The Summary Notice was published in those newspapers on November 17, November 24, December 1, and December 8, 1987. "Tear sheets" (*i.e.* the page in the newspaper on which the Summary Notice appeared showing the date of publication and the name of the newspaper) for each of the publication dates and for each of the newspapers in which the Summary Notice was published were attached as exhibits to Mr. Hooks' affidavit.

Following the mailing of the Individual Notices and the publication of the Summa-

ry Notice, plaintiff's counsel and the Bank received a number of inquiries from class members which were responded to prior to the Fairness Hearing.[9] These inquiries involved different aspects of the Individual Notice and the settlement.

As a result of these inquiries, a Supplemental Notice was mailed on December 4, 1987, to all class members to whom the original Individual Notice was mailed. The Supplemental Notice reiterated that the settlement proceeds listed in the Settlement Summary were the approximate amounts that would go to the Fiduciary Account of which the class member is or was a beneficiary and that the individual class member would not necessarily receive that amount or any portion of the settlement proceeds.

Based on the foregoing, the Court finds that the Individual and Summary Notices fairly apprised class members of the proposed settlement terms and the alternatives available to them in connection therewith. *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195. The Court therefore concludes that the Method of Giving Notice approved by this Court and faithfully executed by the parties meets the reasonableness standard imposed by due process and, therefore, satisfies the requirements of due process. *Mullane v. Central Hanover Bank & Trust Company*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Fowler v. Birmingham News Co.*, 608 F.2d 1055 (5th Cir.1979); and *In re Nissan Motor Corporation Antitrust Litigation*, 552 F.2d 1088 (5th Cir.1977). The Court further concludes that it was the best notice that could have been given to the class members and that it was sufficient to permit this Court to enter a final judgment binding the Defendant and all members of the plaintiff class.[10]

5. Judgment of Counsel for the Parties.

 Courts often accord great weight to the opinions of counsel for the

---

9. The inquiries referred to in Mr. Hooks' affidavit do not include the formal objections which were filed with the Court by some of the class members. These objections will be addressed later in this opinion.

10. Since this class was certified under Rule 23(b)(1) and (2), Fed.R.Civ.P., the judgment herein is necessarily dispositive of the interests of all members of the class as to matters determined herein.

class in approving class action settlements. *Holmes v. Continental Can Company,* 706 F.2d 1144, 1149 (11th Cir.1983). In considering whether or not to approve the settlement, "[t]he trial court is entitled to rely upon the judgment of experienced counsel for the parties. Indeed the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel [citations omitted]." *Cotton,* 559 F.2d at 1330.

In this case, counsel for both parties are competent and able and are experienced in class action litigation and have recommended that the Court approve the settlement. In deciding that this settlement should be approved, the Court has been assisted by this recommendation but has based its decision on an independent determination after reviewing all of the relevant aspects of this case.

### 6. Substance and Amount of Opposition to the Settlement.

■ In reviewing the settlement the Court should examine the settlement in light of the objections raised by any members of the class. *Cotton,* 559 F.2d at 1331. "In assessing the fairness of the proposed compromise, the number of objectors is a factor to be considered but is not controlling." *Id.*

The Court takes special note of the fact that out of the thousands of class members *not even one* interposed an objection to the settlement at the Fairness Hearing. As will be discussed, some written objections were received prior to the Fairness Hearing, but none of these class members made any showing at the Fairness Hearing to support their objections.

In the Individual and Summary Notices specific instructions were given for the filing of any objections to the settlement. These instructions provided that any objecting class member must, on or before Friday, December 18, 1987: (1) File with the Clerk of the United States District Court for the Middle District of Georgia, 120 Twelfth Street, Old Post Office Building, Columbus, Georgia 31901: (a) written notice of the objector's intention to appear at the settlement hearing; (b) the class member's objections or views in writing and (c) all papers to be submitted to the Court at the settlement hearing and/or all papers supporting any objections to the settlement; and (2) on or before Friday, December 18, 1987, mail such notices, objections and papers to plaintiff's counsel and Bank's counsel. The notice also informed class members that if they did not take the above actions, they would not be heard, no papers in objection to the settlement would be received, and they would not be entitled to contest the settlement or its terms.

Prior to the Fairness Hearing the Court received a total of fourteen (14) written objections which were filed in compliance with the instructions that were contained in the Individual and Summary Notices. Four (4) objections were withdrawn prior to the Fairness Hearing, leaving a total of ten (10) objections of record. These objections can be categorized as follows: (1) objections that an individual trust's allocation of the settlement proceeds was not adequate; (2) an objection that the individual notice was misleading in that it was unclear whether the Settlement Summary enclosed with the notice reflected the amount that the individual receiving the notice would receive or whether it indicated the approximate total amount to be allocated to that particular trust; (3) objections which dealt with issues related to individual trusts rather than matters dealing with the Income Fund; and (4) an objection that the amount awarded as attorneys' fees to counsel for the plaintiff class was too large.

■ While a court should address objections filed in opposition to a settlement, the Court believes that, given the nature of the objections in this case, it is sufficient to address these objections by category rather than on an objection by objection basis. For the reasons set forth below, the Court finds that the objections filed in this case are insufficient in number and substance to warrant disapproval of the settlement.

### a. *Objections that an individual trust's allocation of settlement proceeds was not adequate.*

■ Several of the objections filed with the Court were on the basis that the trust

of which the objector is a beneficiary is not receiving an adequate amount of the settlement proceeds. Although the supporting documents submitted with these objections were sketchy, it would appear that these objections are based on the fact that the amount of money these trusts will receive as a part of the settlement is less than the actual losses suffered by the objectors' trusts. As already discussed, a settlement by its very nature is a compromise of the total recovery sought, *Bennett v. Behring,* 737 F.2d at 986, and this settlement does not purport to restore all losses incurred by the various participating trusts. In evaluating a settlement the Court's duty is to consider only whether it is fair, adequate, and reasonable, not whether a more favorable compromise might have been reached. *In re Armored Car Litigation,* 472 F.Supp. 1357, 1368 (N.D.Ga.1979).

These objectors made no effort to show that the total amount of the settlement was inadequate or that the method of allocating the settlement proceeds among the various participating trusts was unfair or favored any group of class members over another. To the contrary, the testimony of Messrs. Crane and Haynes established that the method of allocating the settlement proceeds was fair, accurate, and impartial to all class members. The amount of money received by each trust is based on a number of factors which reflect the portion of the losses sustained by that trust which can be attributed to the Settlement Securities. The fact that a few class members might be desirous of obtaining additional monies is not a sufficient basis for withholding approval of this settlement.

### b. *Objection that notice was misleading.*

 One objection filed with the Court by a class member contended that the Individual Notice she received was misleading in that it was unclear whether the Settlement Summary attached with the notice reflected the approximate amount that she personally would receive or whether it indicated the approximate total amount allocated to her particular trust. This Court reviewed and approved the Individual Notice

before it was mailed and believes that the Individual Notice was clear on this point. The Individual Notice explained that the amounts on the settlement summary were the approximate amounts that would go to the Fiduciary Account.

In addition, a Supplemental Notice was mailed on December 4, 1987, to all class members to whom the original Individual Notice was mailed. The Supplemental Notice reiterated that the settlement proceeds listed in the Settlement Summary attached to the Individual Notice were the approximate amounts that would go to the Fiduciary Account of which the class member was a beneficiary and that the individual class member would not necessarily receive that amount or any portion of the settlement proceeds. Therefore, even if this class member was confused by the original Individual Notice she received, the Supplemental Notice should have cleared up her confusion.

Furthermore, this objector appeared at the Fairness Hearing (in fact, she was the only objector who appeared at the Fairness Hearing) and when asked by the Court if she wished to interpose an objection to the settlement, responded "No."

Based on the foregoing, this Court finds that this objection is without merit.

### c. *Objections which dealt with issues relating to individual trusts.*

 A few objections were raised regarding issues relating solely to individual trusts. These objections did not address the Bank's actions as Trustee of the Income Fund. During the trial of this case this Court ruled that only matters addressing the Bank's actions as Trustee of the Income Fund were relevant and evidence dealing only with individual trust issues would not be admissible in this case. The settlement documents in this case make it clear that only claims relating to the Income Fund are being settled and that claims which might be raised regarding individual trusts are not included and will not be compromised or prejudiced by this settlement.

Therefore, without considering the merits of any objections addressing individual

trusts, the Court finds that they are irrelevant to its determination and do not require the Court to withhold its approval of this settlement.

### d. Objection that amount awarded as attorneys' fees was too large.

█ One objection was received which objected to the amount of attorneys' fees awarded by the Court to counsel for the plaintiff class. This objection is not supported by any evidence, nor does it criticize any particular part of the evidence offered by plaintiff's attorneys in support of the award. The objection arbitrarily asserts that $5,000,000 would be more appropriate. The attorneys' fees in this case are to be paid by the Bank and not from the class settlement fund. Thus, any reduction in attorneys' fees would be of no benefit to the plaintiff class. The Court has, in a previous Order entered October 7, 1987,[11] stated its reasons for its award of attorneys' fees and sees no compelling reason or new evidence which causes it to change its mind. Therefore, the Court finds that this objection is without merit.

█ In addition to the objections described above, a notice was received from an attorney acting on behalf of several class members who are beneficiaries of two trusts. The notice indicated that the class members were in the process of obtaining certain documents from the Bank and that the class members wished to reserve their right to object until after said documents had been obtained. The Court has been informed by counsel for the parties that the documents requested by said class members were received by the class members prior to the Fairness Hearing. In view of the fact that neither the class members nor their attorney appeared at the Fairness Hearing and that the Court has had no subsequent communication from the class members or their attorney, the Court holds that any objection these class members might have had has been abandoned and will not be considered by the Court.

In considering the substance and amount of opposition to the settlement, the Court notes that the formal objections reviewed by the Court numbered less than two-tenths of one percent (0.2%) of the total number of class members to whom the Individual Notice was mailed. Only one class member who had filed a written objection with the Court appeared at the Fairness Hearing and when called on by the Court, indicated that she did not wish to interpose an objection. No evidence or expert testimony was presented at the Fairness Hearing in opposition to the settlement. No objection was made by any class member that the total amount of the settlement was unfair or inadequate or that the method of allocating the settlement proceeds was unfair or favored any group of class members. Therefore, the Court concludes that the objections filed in this case are insufficient to require it to withhold its approval of the settlement.

### 7. State of Proceedings at Which Settlement was Achieved.

█ The Court has already discussed at length the advanced stage of this case at the time the settlement was agreed upon by the parties. Because this case had actually been tried for three weeks and because of the Court's involvement during the discovery and other pretrial proceedings in this case, the Court is fully informed on all significant aspects of this case. Therefore, the Court concludes that it has a sufficient basis for evaluating the settlement.

## III. CONCLUSION

In conclusion, the Court has determined that the settlement in this case is fair, adequate, and reasonable and has been achieved in good faith through arms-length negotiations and is not the product of collusion or fraud between the parties and/or their attorneys. There has been no evidence of unethical behavior or lack of zeal on the part of class counsel. Although the defendant continues to deny liability and it is difficult to predict with certainty the probability of success which plaintiff would have achieved on the merits if this case had been tried to its conclusion, the Court finds that the settlement is fair and adequate,

---

**11.** See *Meyer v. Citizens and Southern National Bank,* 117 F.R.D. 180 (M.D.Ga.1987).

particularly in view of the risks, uncertainties, and considerable expenses which would be associated with continuing this litigation.

The Court also finds that there is a sufficient record on which to base its assessment of the settlement and that the Individual and Summary Notices which were given in this case to all class members was the best notice practical and satisfied the requirements of due process and Rule 23, Fed.R.Civ.P. The objections filed in this case are legally insufficient to prevent this Court's approval of the settlement and, therefore, the Court concurs with the recommendation of the counsel for the parties that this settlement be approved.

Accordingly, it is hereby ORDERED and ADJUDGED:

(1) That the terms of the Settlement Agreement entered into between the parties and on file herein were not the products of fraud or collusion among the parties and/or their counsel and are fair, reasonable, and adequate in accordance with Rule 23, Fed.R.Civ.P., and due process of law;

(2) That the terms of the Settlement Agreement, the Individual and Summary Notices given to all class members, and the Method of Giving Notice to class members satisfy the requirements of due process of law and Rule 23, Fed.R.Civ.P.;

(3) That the terms of the Settlement Agreement and Plan of Distribution, which are both incorporated herein by reference, are approved;

(4) That the Settlement Agreement is binding upon the Bank and all members of the plaintiff class;

(5) That the plaintiff, plaintiff's counsel, defendant, and defendant's counsel, shall comply with and consummate the settlement according to the terms and conditions of the Settlement Agreement and the Plan of Distribution;

(6) That the settlement as approved is a full and final accounting of the Income Fund for the period May 12, 1966, through June 25, 1984, and the Bank and all other C & S Entities as defined in Section I(k) of the Settlement Agreement are released and discharged from all past, present and future claims, of any kind or nature whatsoever, whether legal or equitable, which are, were or could have been asserted in this action with respect to any acts or omissions of the Bank as Trustee of the Income Fund;

(7) That this be a final judgment and that all past, present and future claims, whether legal or equitable, which are, were or could have been asserted in this action with respect to any acts or omissions of Defendant as Trustee of the Income Fund are dismissed with prejudice;

(8) That the award of attorneys' fees and expenses previously made by the Court, as amended, based on subsequent petitions for expenses, is hereby reaffirmed (see separate Order of the Court);

(9) That Lee R. Redmond be and he hereby is awarded the sum of $19,265.57 as fees and expenses incurred or to be incurred in connection with his service as guardian ad litem in this action; and

(10) That the firm of H.L. Raburn Co., accountants for the class appointed by the Court to monitor and review the settlement proceedings, is hereby awarded the sum of $37,070.13 as fees and expenses.