PRETTY et al., Appellants and Cross–Appellees,

v.

MUELLER; Group Health Associates, Appellee and Cross–Appellant

[Cite as *Pretty v. Mueller* (1997), 132 Ohio App.3d 717.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–970011 and C–970332.

Decided Dec. 19, 1997.

*Lindhorst & Dreidame* and *Gary F. Franke,* for appellants and cross-appellees.

*Jacobson, Maynard, Tuschman & Kalur Co., L.P.A., Karen Clouse* and *David Lockmeyer,* for appellee and cross-appellant.

HILDEBRANDT, Judge.

Plaintiffs-appellants and cross-appellees, Donald and Carole Pretty ("Pretty"), and defendant-appellee and cross-appellant, Group Health Associates ("GHA"), appeal from the judgment entered upon a jury verdict finding GHA liable to Pretty for medical malpractice. Dr. Thomas Mueller, an employee of GHA and Pretty's primary-care physician, was found not negligent in the action. In Pretty's appeal, he claims, in his sole assignment of error, that the trial court erroneously limited Pretty's cross-examination of Dr. Mueller's and GHA's expert witness, Dr. Brand. In the cross-appeal, GHA claims that, as Dr. Mueller's employer, it could not be liable for medical malpractice when the jury specifically found that Dr. Mueller had not been negligent in his care and treatment of Pretty. For the following reasons, we overrule Pretty's only assignment of error but sustain the first assignment of error in GHA's cross-appeal. As to the cross-appeal, therefore, we reverse and enter final judgment in favor of GHA.

## FACTUAL BACKGROUND

Donald Pretty sued Dr. Mueller for malpractice arising out of Dr. Mueller's failure to diagnose Pretty's diverticulitis, a condition that arises when certain growths or pockets on the colon, known as diverticuli, become inflamed. The

presence of diverticuli on the colon is known as diverticulosis; the inflammation or infection of diverticuli is known as diverticulitis. Although many persons over age sixty have diverticulosis, not all of them will develop diverticulitis. Pretty claimed that Dr. Mueller's failure to diagnose his diverticulitis caused his condition to worsen to the point that the diverticuli caused a rupture in Pretty's bowel, necessitating removal of part of his bowel.[1] Pretty claimed that if his condition had been timely and properly diagnosed, he could have begun a regimen of antibiotics and high-fiber meals, which would have prevented the rupture. Dr. Mueller and GHA contended that the symptoms Pretty presented would not have led a reasonably prudent physician to diagnose diverticulitis, and that, in any event, any treatment of his diverticulitis would not have prevented the rupture in Pretty's bowel.

Pretty began seeing Dr. Mueller, a physician employed by GHA, in 1992. Dr. Mueller practiced internal medicine. Pretty, a welder, was fifty-six years old at the time he began seeing Dr. Mueller. It is undisputed that because of his age and typical "American" diet (low fiber, high fat), Pretty was predisposed to develop diverticulosis, which, as stated above, is sometimes a precursor to diverticulitis. Although the symptoms of diverticulitis are nonspecific, for a person of Pretty's age and eating habits, diverticulitis ordinarily produces severe lower left-quadrant abdominal pain, constipation, diarrhea, fever and chills.

Dr. Mueller testified that it was his standard practice to maintain a record of patients' visits, using a common formula known as SOAP: the *s*ubjective complaints of the patient; the *o*bjective findings on examination; his *a*ssessment of the problem based on the patient's history and complaints and on his own findings on examination; and finally a *p*lan for treatment based on the assessment. On a patient's first visit to the office, a nurse would ask for and record the patient's stated reason for seeing Dr. Mueller, and Dr. Mueller would take some handwritten notes during the examination process. After the visit, Dr. Mueller would dictate more detailed notes about the patient's symptoms, his analysis, and his plan for treatment. Dr. Mueller stated that he followed this procedure every time he saw Pretty.

GHA's records disclose that Pretty visited Dr. Mueller on April 17, 1992, for back pain and again on November 19, 1992, for difficulty in his breathing. He saw Dr. Want, an internist, on January 11, 1993, for treatment of a scrotal mass, and Dr. Want referred Pretty to Dr. Pliskin, a urologist. Pretty met with Dr. Pliskin the same day, and Dr. Pliskin diagnosed an inguinal hernia in addition to

---

1. Carole Pretty is Donald Pretty's wife. She sued GHA and Dr. Mueller for loss of consortium.

the scrotal mass and referred Pretty to Dr. Grannan, a surgeon, for repair of the hernia.

On January 22, 1993, Pretty met with Dr. Grannan, who examined Pretty for the inguinal hernia and scheduled him for surgery. Dr. Mueller's notes show that, three days later, Pretty returned to his office complaining of "acute onset of severe, crampy lower abdominal suprapubic discomfort." While Pretty stated that he was having some difficulty and pain in urinating, he denied bowel disturbances. Dr. Mueller had not communicated with Dr. Want, Dr. Pliskin, or Dr. Grannan about Pretty's condition, although he had read the notations in Pretty's chart made by the other physicians.

Dr. Mueller indicated in his notes that he believed that Pretty was suffering from a urinary-tract infection or prostatitis, based on the difficulty Pretty had been experiencing recently with his genitourinary system. Dr. Mueller stated that he did not consider diverticulitis as a possible cause of the pain, and he performed no tests that would have eliminated diverticulitis as the cause of Pretty's symptoms.

Dr. Mueller gave Pretty a prescription for an antibiotic and for medication to treat bladder spasms. He informed Pretty to call the office if the symptoms persisted after several days. On January 27, Pretty called Dr. Mueller's office, still complaining of abdominal pain. Although Dr. Mueller did not recall personally meeting with Pretty on January 27, Pretty specifically recalled seeing Dr. Mueller that day, and Dr. Mueller's office records show that at least two blood tests were performed that day. The records also contain a notation that Dr. Mueller's office made an appointment for Pretty with Dr. Grannan for January 29 to have Dr. Grannan examine Pretty for treatment of abdominal pain. Dr. Mueller prescribed a painkiller for Pretty.

A notation in the record indicates that the appointment with Dr. Grannan was canceled, but Pretty denied that Dr. Mueller referred him to Dr. Grannan or that he ever canceled an appointment with Dr. Grannan.

On February 2, 1993, Dr. Grannan repaired Pretty's hernia, and there were no complications with that surgery. Pretty again saw Dr. Grannan on February 19 for a follow-up to the surgery. Pretty claimed that he told Dr. Grannan that his left side was puffed out and that he was having stomach pain. Dr. Grannan's notes indicate only that Pretty's complaints of pain were consistent with postoperative discomfort and that Pretty did not indicate to him that any other problem existed.

The next entry in the chart was made on February 23, 1993, when Pretty saw Dr. Mueller and complained of shoulder pain. Another dispute in the testimony exists regarding this visit, as Pretty said that he complained of abdominal pain, but Dr. Mueller made no notation of such a complaint in the chart. On March

12, 1993, Dr. Grannan again examined Pretty as a follow-up to the hernia surgery. His notes indicate that Pretty was "asymptomatic" on that date. Pretty saw Dr. Mueller again on March 17, 1993, and complained of shoulder pain and, according to Pretty, also of abdominal pain. Dr. Mueller's notes reflect that Pretty complained of shoulder pain but nothing else.

When Pretty met with Dr. Mueller on March 24, 1993, Dr. Mueller noted "acute onset of lower abdominal crampy discomfort, fatigue, malaise, and dizziness." Pretty denied having chills or fever. Discarding his earlier belief that Pretty suffered from some genitourinary problem, Dr. Mueller suspected that Pretty's problems were gastrointestinal. He believed at that time that Pretty was suffering from irritable-bowel syndrome and prescribed medication to treat the condition. He did not consider diverticulitis as a diagnosis.

When Pretty was seen at an Urgent Care center on March 26, he stated that the abdominal pain had become much worse and that he was nauseous. The doctor examining him indicated that he appeared to be very ill, and he noted distention and tenderness in the abdomen, as well as a large suprapubic mass. The doctor indicated that he suspected urinary retention with bladder distention, but he could not clearly identify the etiology of the pain.

Pretty was admitted to the hospital, where the diagnosis of a ruptured bowel due to diverticulitis was ultimately made, based on an abdominal x-ray that was taken in the hospital's emergency room. Dr. Kerlakian, another GHA physician, performed surgery on Pretty to remove the rupture and the surrounding infected areas of the bowel. Because of the colostomy, Pretty was required to wear a colostomy bag for approximately six weeks. On May 28, 1993, Pretty underwent an additional surgery to close the colostomy.

## DEVELOPMENTS AT TRIAL

At trial, Drs. Mueller, Grannan, and Kerlakian all testified regarding their treatment of Pretty. Drs. Bope and Brand testified as expert witnesses for GHA. Each of these physicians stated an opinion that, given the symptoms presented by Pretty during his consultations with Dr. Mueller, Dr. Mueller was not negligent in failing to diagnose diverticulitis as the cause of Pretty's pain. Dr. Pollyea testified as an expert witness for Pretty, stating that, in his opinion, Dr. Mueller should have diagnosed diverticulitis in January 1993, and that the failure to make the diagnosis and begin treatment caused Pretty's condition to advance to the point of rupture, requiring two surgeries. After closing argument, the court recited the jury instructions to the jurors, including the following statement:

"[T]he Plaintiff must prove to you by the greater weight of the evidence that Dr. Mueller was negligent and/or that Group Health Associates was negligent and that that negligence proximately caused the injury to Donald Pretty.

"Now, you're instructed that you have to look to each of those two defendants to determine whether or not there was negligence there.  * * * [I]f you find that Dr. Mueller was negligent, * * * Group Health Associates, Inc., then also would be liable because they employ Dr. Mueller just as they employed some of the other experts that were here on the stand.  * * * Negligence of someone else who is employed by Group Health Associates, Inc. and that negligence imputed to the group [sic ]."

After the instructions were given, counsel for defendants objected to the statements noted above.  Counsel indicated agreement that if Dr. Mueller were found negligent, then GHA, as his employer, would also be liable for negligence.  Counsel argued, however, that the instruction was erroneous because it informed the jurors that they could find GHA negligent even if they found that Dr. Mueller was not.  The trial judge responded by stating that the case had been tried as a malpractice case against all of the doctors employed by GHA.  The judge further noted that counsel for defendants had stated no objection to testimony regarding the negligence of Dr. Grannan in allegedly not charting Pretty's complaints of abdominal pain.

Later, the jurors sent a question to the court.  The inquiry read: "Can we find Group Health Associates and not just Dr. Mueller guilty?"  The trial judge questioned the jurors about the inquiry, and one of them explained that they wanted to know whether they could find that GHA was negligent "but exclude then Dr. Mueller."  The trial judge told the jurors that such a result was "possible."  Counsel for both plaintiffs and defendants objected.  Pretty's counsel stated that he was not certain that the jurors understood that they could find GHA liable "based on some other act of another employee in another instance."  Counsel for defendants repeated his objection to the instruction, stating that GHA could not be found negligent if Dr. Mueller was found not negligent, since there was no evidence that the conduct of any other GHA physician proximately caused harm to Pretty.

Subsequently, the jury returned with a verdict in favor of Pretty.  The jurors specifically found that Dr. Mueller was not negligent, but that GHA was.  The jury awarded Pretty $162,500.  The trial court overruled defendants' subsequent motion for judgment notwithstanding the verdict.

## ISSUES ON APPEAL

Plaintiffs-Appellants' Assignment of Error

■   On appeal, Pretty argues that the trial court erred by limiting his counsel's cross-examination of one of GHA's expert witnesses.  After reviewing

the record, we find that this assignment of error is not well taken. Counsel for GHA began examination of Dr. Brand at 10:25 a.m. The examination fills thirty-eight pages of the trial transcript. Counsel for Pretty began cross-examination at 12:15 p.m., and that examination fills forty-eight pages of the transcript before the court indicated that Pretty's counsel would be limited to another fifteen minutes. Counsel did not object, and, in fact, when given the opportunity to re-cross Dr. Brand, he stated that he had nothing further. We hold that the trial court did not unfairly limit counsel's cross-examination of defendants' expert witness.

Defendant and Cross-Appellant's Cross-Assignments of Error

GHA's cross-appeal raises two assignments of error. First, GHA argues that the trial court erred as a matter of law in permitting the jury to render separate verdicts against Dr. Mueller and GHA and further by denying GHA's motion for judgment notwithstanding the verdict. Second, GHA contends that the trial court erred in refusing to give the interrogatories submitted by GHA to the jury. We sustain the first assignment of error and hold the second to be moot.

As a preliminary matter, we note that Pretty's appellate brief specifically addresses the issue of whether the other GHA doctors' alleged negligence was tried by implied consent. GHA does not address this issue in its brief, and we presume that GHA therefore concedes the propriety of trying the negligence claims against GHA doctors other than Dr. Mueller.

GHA claims that the trial court erred in instructing the jury that GHA could be found liable for negligence even if Dr. Mueller were not. GHA could have been liable for Dr. Mueller's negligence under the theory of *respondeat superior*, since Dr. Mueller was acting as GHA's employee and agent. See, *e.g.*, *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 578, 613 N.E.2d 1014, 1020. As GHA correctly points out, when an employee accused of wrongdoing has been found to have no liability to the party claiming injury, the employer cannot be independently found liable under a theory of *respondeat superior* since any liability of the employer is only derivative of that of the employee. See *Strock v. Pressnell* (1988), 38 Ohio St.3d 207, 217, 527 N.E.2d 1235, 1244; *Moncol v. N. Royalton School Dist. Bd. of Edn.* (1978), 55 Ohio St.2d 72, 9 O.O.3d 75, 378 N.E.2d 155, syllabus.

Here there was a potential for GHA's liability to be predicated upon the negligence of an employee other than Dr. Mueller, since evidence was presented at trial that other GHA physicians treated Pretty. But the trial court could properly charge the jury as it did only if there was evidence presented at trial to show that another agent or employee of GHA was negligent and that this negligence proximately caused Pretty's injuries.

■ On appeal, Pretty argues that the evidence presented at trial could have led the jury to find that Dr. Grannan was negligent. All of the expert witnesses at trial stated an opinion that if Pretty had complained of abdominal pain while seeing Dr. Grannan and Dr. Grannan failed to note that complaint in the chart or to examine Pretty, then Dr. Grannan would have fallen below the standard of care. As indicated above, Pretty testified that he did complain of abdominal pain to Dr. Grannan, but Dr. Grannan's records contain no indication of this complaint. If the jury believed Pretty, then the evidence would support a finding that Dr. Grannan's treatment of Pretty fell below the standard of care.

However, it is not enough to establish that Dr. Grannan's alleged failure to chart fell below the applicable standard of care. The jury instruction given by the trial court was proper only if Pretty produced expert evidence of a causal connection between that alleged deficiency and his injuries. See *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, paragraphs one and two of the syllabus; *Bailey v. Chu* (1992), 80 Ohio App.3d 627, 633, 610 N.E.2d 531, 535–536.

In this case, Pretty presented absolutely no evidence of a causal connection between Dr. Grannan's alleged negligence and Pretty's injury. None of the experts at trial testified that Dr. Grannan's failure to chart was a proximate cause of any injury to Pretty. None of the experts testified that Dr. Grannan should have diagnosed diverticulitis on February 19 or March 12, 1993, or that a diagnosis at that time would have prevented Pretty's disease from resulting in a ruptured bowel.

Pretty's expert, Dr. Pollyea, testified that Dr. Mueller should have diagnosed Pretty's diverticulitis by January 25, 1993, and that, with proper treatment, Pretty's disease would have had only a ten-percent chance of advancing to the point of a bowel rupture. Dr. Pollyea did not testify that Dr. Grannan should have diagnosed diverticulitis, or that Dr. Grannan's alleged failure to chart Pretty's complaints had any causal connection to the eventual rupture of Pretty's bowel and the consequent colostomy.

In fact, Pretty's expert testified with respect to Dr. Grannan:

"On March 12, 1993, the patient was seen by Dr. Grannan. He is now six weeks beyond his inguinal hernia repair. Dr. Grannan finds no problem. 'Wound looks fine.'

"Of course, now, remember, Dr. Grannan is looking at the after effects of his surgical work. *That's what he's there for.*

"When you send somebody to a specialist, most of the time the specialist hones in on what they're expected to be dealing with. I mean, if you send someone to a cardiologist, they're going to be concerned about his heart and not his knee pain.

*"So Dr. Grannan is doing what he should do."* (Emphasis added.)

The record, in short, is devoid of expert testimony or other evidence linking any conduct by Dr. Grannan to the injury ultimately sustained by Pretty.

In his brief on appeal, Pretty refers to no other physician whose conduct would support a finding of malpractice. None of the experts questioned the treatment rendered by Drs. Want or Pliskin, or by the medical personnel at Urgent Care, or at the hospital where the colostomy was performed.

■ We sustain GHA's first cross-assignment of error and hold that the trial court erred as a matter of law in instructing the jury that GHA could be found liable for malpractice even if Dr. Mueller were not negligent, since there was no evidence or testimony presented that the action or inaction of any GHA physician other than Dr. Mueller was a proximate cause of Pretty's injuries. The jury returned a verdict finding Dr. Mueller not negligent, a finding that is not challenged on appeal. Since Dr. Mueller was found not to have committed malpractice, GHA, as employer and principal, is likewise absolved of liability.

We hold that the trial court erred in instructing the jurors that they could find *for* Dr. Mueller but still find *against* GHA. The trial court also erred by rejecting GHA's motion for judgment notwithstanding the verdict, since the jurors found Dr. Mueller free from liability for malpractice, and no other agent or employee of GHA was shown to have negligently caused Pretty's injury.

## CONCLUSION

Because of our disposition of GHA's first cross-assignment of error, we need not reach the second. Accordingly, we overrule the assignment of error in Pretty's appeal, sustain GHA's first cross-assignment of error, and hold GHA's second cross-assignment of error to be moot. The judgment below as it relates to GHA in the cross-appeal in case No. C–970332 is reversed, and final judgment is hereby entered in favor of GHA. As to the appeal in case No. C–970011, the judgment is affirmed.

*Judgment accordingly.*

DOAN, P.J., and MARIANNA BROWN BETTMAN, J., concur.