[Cite as *Thompson v. Butler*, 2013-Ohio-1075.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

ANN WATSON THOMPSON, et al. :
:           Appellate Case No. 25408
Plaintiff-Appellants     :
:           Trial Court Case No. 10-CV-5944
v.                       :
:
ADOLPHUS BUTLER, et al.  :           (Civil Appeal from
:            Common Pleas Court)
Defendant-Appellees      :
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of March, 2013.

. . . . . . . . . .

MICHAEL T. MANN, Atty. Reg. #0073845, Mann & Mann, LLC, 115 West Ninth Street, Cincinnati, Ohio 45202
        Attorney for Plaintiff-Appellants, Ann Watson Thompson, et al.

MICHAEL R. SCHMIDT, Atty. Reg. #0022999, Cohen, Todd, Kite & Stanford, LLC, 250 East Fifth Street, Suite 2350, Cincinnati, Ohio 45202-5136
        Attorney for Defendant-Appellee, Adolphus Butler

CHRISTOPHER P. FISHER, Atty. Reg. #0068456, Ulmer & Berne LLP, Skylight Office Tower, 1660 West 2nd Street, Suite 1100, Cleveland, Ohio 44113-1448
and
JESSE R. LIPCIUS, Atty. Reg. #0078274, Ulmer & Berne, LLP, 600 Vine Street, Suite 2800, Cincinnati, Ohio 45202-2409
        Attorneys for Defendant-Appellee, KeyBank National Association

. . . . . . . . . . . . .

HALL, J.

{¶ 1}   Ann Thompson and her two children, Mark and Christie Thompson, appeal from the trial court's entry of summary judgment against them on their complaint alleging tortious interference with an expected inheritance and breach of trust. The appellees are a former Key Bank employee, Adolphus Butler, and Key Bank itself.

{¶ 2}   The Thompsons advance two assignments of error on appeal. First, they contend the trial court erred in entering summary judgment on their tortious-interference claim on the basis that (1) it is barred by the applicable statute of limitation, (2) it is barred by a settlement agreement, and (3) it fails on the merits as a matter of law. Second, they contend that the trial court erred by entering summary judgment on the breach-of-trust claim on the basis that it is barred by the statute of limitation.

{¶ 3}   The present appeal revolves around the estate plan of Ann Thompson's father, Warren Watson, who was born in 1910 and died in 1996. Prior to his death, Watson was a successful businessman who amassed a multi-million-dollar estate. After Watson's wife died in 1983, a friend and employee, Charlotte Holland, began living with him. Warren Watson's attorney indicated that Watson and Holland held themselves out as a "couple." In 1993, Watson executed a will and a declaration of trust. Holland was a beneficiary of most of Watson's property under the 1993 will. She also was a seventy-five percent income beneficiary of two trusts. Upon Holland's death, Watson's grandchildren, Mark and Christie, would become the beneficiaries of the trusts, which is why the trust property was divided into two trusts, one to take maximum advantage of the generation-skipping tax exemption, and one that could be subject to the tax. In 1995 and 1996, Watson made Holland a

one-hundred-percent income beneficiary under the two trusts. Warren Watson's estate plan did not directly provide for his daughter, plaintiff Ann Thompson, because she was the beneficiary of a separate substantial "C.P. Watson Trust" that had passed from Ann Thompson's grandfather to her father, Warren Watson, and, upon his death, would pass to her. The C.P. Watson Trust is not at issue with regard to the tortious-interference claim.

{¶ 4}     Following Watson's death in 1996, the Thompsons discovered that Holland had received much more from his estate than they expected. They threatened a will contest, alleging that Holland had exerted undue influence to obtain her inheritance. In January 1997, the Thompsons and Holland entered into a written settlement of their dispute. Pursuant to the agreement, Holland disclaimed eighty percent of her interest in the two trusts at issue.

{¶ 5}     Over eight years later, Holland died in April 2005, leaving most of her estate to Adolphus Butler, who had retired from Key Bank in 2003. Prior to his retirement, and before Watson's death, Butler had developed a professional relationship with Watson and had serviced Watson's accounts for years. Although the parties dispute the extent of Butler's involvement, the Thompsons alleged below that Butler was privy to Watson's estate-planning documents and was heavily involved with them. After Holland died, the Thompsons became aware that she had left most of her own estate to Butler. That fact raised their suspicion about Butler's possible role in Holland having inherited from Watson.[1]

{¶ 6}     Following Holland's death, the remainder of the trusts was distributed into separate trust accounts for Mark and Christie Thompson. Key Bank served as the trustee of

---

[1]The Thompsons' appellate brief details Butler's interaction with Watson and the basis for their suspicions about him. Although we have reviewed their brief and the record, our resolution of the issues before us does not require extensive discussion of Butler's role in Watson's affairs.

those accounts. The Thompsons believe Key Bank serviced those accounts poorly after they complained in 2005 about former bank employee Butler inheriting most of Holland's estate (which in turn consisted largely of what she had inherited from Watson and had retained under the settlement). The Thompsons' dissatisfaction led them to file suit against Butler and Key Bank in 2007 for tortious interference with an expected inheritance. They voluntarily dismissed that lawsuit and filed the present action in 2010, re-asserting the tortious-interference claim against Butler and Key Bank and adding a breach-of-trust claim against the bank.

{¶ 7}    Butler and Key Bank separately moved for summary judgment on the Thompsons' complaint. Following briefing, the trial court sustained the motion. In a short September 20, 2012 entry, the trial court held that the tortious-interference claim was barred by the applicable statute of limitation, that it was barred by the settlement agreement, and that it failed on the merits as a matter of law. With regard to the breach-of-trust claim, the trial court found it time barred as well.[2] This appeal followed.

{¶ 8}    In their first assignment of error, the Thompsons contend the trial court erred in entering summary judgment on their tortious-interference claim. Although they challenge each aspect of the trial court's ruling, we will focus on the settlement agreement, which is dispositive.

{¶ 9}    As part of the 1997 settlement, the Thompsons each agreed "not to take any action by judicial proceedings or otherwise to contest the validity or enforceability of any of

---

[2]The trial court also found a claim for removal of Key Bank as trustee barred by the statute of limitation. That ruling is not at issue on appeal.

the provisions of the Watson Will or Watson Trust Declaration." (Doc. #95, Exh. A, p. 2). In return, Holland disclaimed eighty-percent of her interest in the trusts. (*Id*. at p. 3-4). The settlement provides: "This Agreement shall be binding upon and shall inure to the benefit of Holland, Thompson and each of the Thompson children and their respective heirs, administrators, executors, successors and assigns." (*Id*. at p. 6).

{¶ 10} Upon review, we conclude that the Thompsons' tortious-interference claim necessarily qualifies as "any action by judicial proceeding * * * to contest the validity * * * of the * * * Watson Trust Declaration." The tortious-interference claim alleges that "Defendant Butler, and vicariously, Key [Bank], intentionally interfered with [the Thompsons' expectancy of an inheritance] when Butler, while acting within the scope of his employment with Key, prepared Mr. Watson's will to improperly benefit Ms. Holland and deprive the Plaintiffs of their rightful share of Mr. Watson's estate." (Complaint, Doc. #1, at 57). The complaint further alleges that "Defendant Butler exerted coercion, duress, fraud and/or undue influence upon Warren Watson, which resulted in Mr. Watson's aforementioned amendments to his Last Will and Testament and his Declaration of Trust, all to the benefit of Charlotte Holland and Defendant Butler and to the detriment of Plaintiffs who were the natural objects of Warren Watson's affection and beneficence." (*Id*. at ¶12).

{¶ 11} In our view, the tortious-interference claim is a challenge to the "validity" of Watson's trusts on the basis that they resulted from coercion, duress, fraud, or undue influence exerted by Butler.[3] Under paragraph twenty of the settlement, however, the Thompsons'

---

[3]The Thompsons admit in their complaint that the claims they settled with Holland were virtually identical to their current tortious-interference claim against Butler and Key Bank. Paragraph nine of the complaint states: "* * * Plaintiffs commenced will contest proceedings against Ms. Holland as the fiduciary of Mr. Watson's Estate, alleging, among other things, that Ms. Holland, who was not the

agreement not to challenge the validity of the trusts through any judicial proceeding inured to the benefit of Holland and her heirs. Butler inherited from Holland upon her death, making him her "heir."[4] Therefore, Butler can enforce the Thompsons' promise not to challenge the validity of Watson's trusts, which the tortious-interference claim impermissibly does. Because the settlement agreement precludes the Thompsons from pursuing a tortious-interference claim against Butler, they cannot pursue one vicariously against Key Bank. *See*, *e.g.*, *Pretty v. Mueller*, 132 Ohio App.3d 717, 723, 726 N.E.2d 503 (1st Dist.1997).

---

natural object of Mr. Watson's affections, had exerted undue influence, duress and fraud upon Mr. Watson to procure and secure the aforementioned amendments to his Last Will and Testament and his Declaration of Trust. Subsequently, Plaintiffs reached settlement of their will contest claims with Ms. Holland in January of 1997."

[4] *See* Merriam-Webster's online, http://www.merriam-webster.com/dictionary/heir, defining an "heir" as "one who inherits or is entitled to inherit property."

{¶ 12} In opposition to the foregoing conclusion, the Thompsons argue that Butler should not be permitted to "hide behind" the settlement agreement simply because he inherited from Holland. But that is what the Thompsons' own agreement allows, insofar as it inures to the benefit of Holland's heirs. Although the Thompsons complain that Butler's inheritance was the result of tortious conduct, so too, according to them, was Holland's inheritance. Even if Butler has "unclean hands," as the Thompsons argue, his hands, according to them, are no less clean than Holland's hands. In this regard, we find it worth noting that Butler inherited from Holland only what the Thompsons had consented to let her have in the settlement agreement. Legally speaking, Holland's disposition of her own property upon her death was her concern. The first assignment of error is overruled.[5]

{¶ 13} In their second assignment of error, the Thompsons contend the trial court erred in finding their breach-of-trust claim against Key Bank time barred. The parties agree that the applicable statute of limitation is found in R.C. 5810.05(C)(4), which provides in relevant part: "[A] judicial proceeding by a beneficiary against a trustee for breach of trust must be commenced within four years after the first of the following to occur: * * * (4) The time at which the beneficiary knew or should have known of the breach of trust."

{¶ 14} To resolve the statute-of-limitation issue, we first must determine the scope of the breach-of-trust claim. In their complaint, the Thompsons set forth the claim only with a

---

[5] Having determined that the tortious-interference claim is barred by the 1997 settlement agreement, we need not decide whether the trial court correctly found the claim barred by the statute of limitation or whether the trial court correctly rejected it on the merits as a matter of law. We note, however, that the tortious-interference claim is potentially barred for still another reason. The Tenth District has determined that "[b]efore pursuing an IIEI [intentional interference with an expected inheritance] claim, a plaintiff must first exhaust all appropriate probate procedures." *Cunningham v. Cunningham*, 10th Dist. Franklin No. 08AP-1049, 2009-Ohio-4648, ¶19. "The rationale is that the probate proceedings may resolve the damages issue by simply validating the will through which the plaintiff claims an expectancy." *Id.* Here the Thompsons voluntarily by-passed a probate court will contest in favor of a binding settlement.

broad assertion that Key Bank "materially breached its fiduciary duty to plaintiffs." (Doc. #1 at ¶62). Elsewhere in their complaint, the Thompsons allege facts that appear to be intended to support a breach-of-trust claim. (*Id*. at ¶45-54). In depositions, the Thompsons' expert witnesses, Lynn Burns and John Rodgers, also discussed certain things they believe Key Bank did improperly. (*See* May 24, 2012 depo. of Lynn Burns; May 31, 2012 depo. of John Rodgers).

**{¶ 15}** The clearest explication of the breach-of-trust claim, however, is found in the Thompsons' appellate brief. There they identify eight ways they believe Key Bank committed a breach of trust: "(1) overpayments from trust principal; (2) undocumented payments to Holland from trust principal; (3) inefficient tax management; (4) inattention to trust assets; (5) failing to prepare or produce Reg-9's; (6) treating Holland more favorably; (7) improperly allocating income and capital gains from the trusts; and (8) keeping the C.P. Watson trust open." (Appellants' brief at 23).

**{¶ 16}** The record reflects that Key Bank assumed its fiduciary duties as trustee upon Watson's death on September 6, 1996. The Thompsons filed their complaint containing the breach-of-trust claim on July 27, 2010. Therefore, any alleged breach of trust about which the Thompsons knew or should have known prior to July 2006 is time barred under R.C. 5810.05(C)(4).

**{¶ 17}** As noted above, the first alleged breach pertains to "overpayments from trust principal." The alleged overpayments are payments Key Bank made to Holland from trust principal as opposed to trust income. Holland died in 2005. The Thompsons' expert witness, Lynn Burns, determined that these overpayments were made based on her review of Holland's

annual trust statements. (Burns depo. at 76). In their brief, the Thompsons allege that these overpayments were made between 1998 and 2005. (Appellants' brief at 23; *see also* Burns depo. at 113-118). Even setting aside the fact that the trust documents *expressly permitted* discretionary payments to Holland from trust principal (Doc. #95, Exh. B, Articles IV(A)(2), IV(B)(2), VII(A)(5)), [6] Mark and Christie Thompson both admitted receiving copies of Holland's annual trust statements. (*See* May 15, 2012 depo. of Mark Thompson at 94; May 15, 2012 depo. of Christie Thompson at 58). We conclude, therefore, that they knew or should have known about the alleged overpayments before July 2006. [7]

{¶ 18} The second alleged breach concerns "undocumented payments to Holland from trust principal." This alleged breach is a variant of the prior one. According to Burns, some of the trust payments to Holland were documented in the trust statements as payments to the beneficiary. Some, however, were documented as other disbursements. (*See*, *e.g.*, Burns depo. at 147-149). Burns believed this lack of precise documentation made it difficult for an ordinary person to know how much money Holland had received without going "through every single transaction." (*Id*. at 148). She admitted, however, that the information could be gleaned from the trust statements and that the Thompsons "may have been able" to discover it. (*Id*. at 150-151). Although determining precisely how much money Holland had received may have required a close reading of the statements, Mark and Christie Thompson had the statements, were admittedly suspicious of both Holland and the bank, and, we conclude, they

---

[6] In his deposition, the Thompsons' expert witness, John Rodgers, acknowledged that discretionary distributions to Holland were permitted. (May 31, 2012 Rodgers depo. at 93).

[7] Plaintiff's expert Burns herself acknowledged that the annual statements were sufficient to raise "concerns or suspicions" about Holland receiving "overpayments." (Burns depo. at 177-178).

therefore knew or should have known about the allegedly "undocumented" payments before July 2006.

{¶ 19} The third alleged breach concerns "inefficient tax management." This issue involves Burns' opinion that Key Bank should have sold certain investments at a loss to offset capital gains from the sale of other investments. (Burns depo. at 125-126). According to Burns, sales to generate capital losses offsetting capital gains should have occurred between 1998 and 2005, when Holland was the trust beneficiary. (*Id*. at 138). Such sales would have reduced capital-gains taxes to the benefit of the remainder beneficiaries, Mark and Christie Thompson. (*Id*. at 126). To arrive at her opinion, Burns reviewed tax returns and noticed the existence of capital gains. She then examined Holland's trust statements and saw unrealized losses. (*Id*.). As noted above, however, Mark and Christie Thompson had access to the same statements, and they were admittedly suspicious of Holland and the bank. Therefore, prior to July 2006, they knew or should have known about Key Bank's failure to realize capital losses between 1998 and 2005.

{¶ 20} The fourth alleged breach involves "inattention to trust assets." This issue concerns Key Bank's discontinuance of the sale of Key Corp stock from Mark and Christie Thompson's trust accounts. The record reflects that Key Bank periodically sold Key Corp stock from the trust accounts until 2005, when the sales stopped. According to the Thompsons, the timing of this discontinued divestment coincided with their questioning of Key Bank about Butler's inheritance from Holland. (Appellants' reply brief at 6). In her deposition, Ann Thompson admitted that, around the time of Holland's death, the Thompsons had discussed certain "issues" regarding Key Bank's administration of Mark and Christie

Thompson's trusts. Those issues included Key Bank not "getting rid of [the Key Corp stock] at all." (May 25, 2012 depo. of Ann Thompson at 11-12).

**{¶ 21}** Notably, however, the Thompsons' expert witness, John Rodgers, acknowledged that Warren Watson held a large quantity of Key Corp stock when he created the trusts at issue.[8] Rodgers also acknowledged that Watson's declaration of trust expressly allowed Key Bank to retain in the trusts the Key Corp stock that funded them. (Rodgers depo. at 106-108). Specifically, the declaration of trust gave Key Bank, as trustee, the power and discretion "[t]o retain for any period of time without limitation, and without liability for loss or depreciation in value, any property transferred to the Trustee, * * * including * * * stocks, * * * even though the Trustee could not property purchase the property as a trust investment and though its retention might violate principles of investment diversification[.]" (Doc. #95, Exh. B, Article VII(A)(1)). Despite this clear language, Rodgers insisted that Key Bank had a fiduciary duty to diversify the trusts by divesting Key Corp stock. (Rodgers depo. at 106-108). Assuming, arguendo, that Rodgers is correct, Key Bank stopped divesting Key Corp stock from the trust accounts in 2005. (Mark Thompson depo. at 116; Christie Thompson depo. at 67). As noted above, Ann Thompson testified that the discontinued divestment was an issue the Thompsons discussed in 2005, and Mark and Christie Thompson received quarterly account statements that would have shown the lack of sales. (Mark Thompson depo. at 107-108; Christie Thompson depo. at 34). Therefore, if Key Bank stopped selling Key Corp. stock in 2005, the Thompsons knew or should have known about the discontinued divestment

---

[8] In his deposition, Rodgers explained: "I understand that Mr. Watson's father and grandfather were, I believe, on the board of perhaps a predecessor bank to Key Bank and that he had a lot of Key Bank stock." (Rodgers depo. at 49).

prior to July 2006.

**{¶ 22}** The fifth alleged breach involves "failing to prepare or produce Reg-9's." In his deposition, Key Bank trust officer Timothy O'Neill explained that "Regulation 9" is a federal regulation requiring annual review of trust accounts by a bank's trust committee.[9] (April 17, 2012 depo. of Timothy O'Neill at 19-20). Until 2004 or 2005, Regulation 9 annual reviews resulted in a written document. (*Id*. at 34). They now are done electronically at Key Bank. (*Id*.). As a result, O'Neill explained that there no longer may be a paper record of Regulation 9 reviews. (*Id*. at 47). Later, in a continued deposition, O'Neill was asked whether any Regulation 9 reports existed "for 2005 forward to the present." (July 3, 2012 depo. of Timothy O'Neill at 120). He responded that he did not know. (*Id*.). Shortly thereafter, he identified what he believed was a computer print out for an electronic 2004 Regulation 9 review. (*Id*. at 122). When asked where similar reports might be for "2005 to the present," O'Neill responded, "I don't know." (*Id*. at 123). The Thompsons rely on O'Neill's testimony to argue that Key Bank committed a breach of trust by "failing to prepare or produce Reg-9's" beginning in 2005. (Appellants' brief at 14, 23).

**{¶ 23}** Following the cited portion of O'Neill's deposition testimony, however, he made clear that the required Regulation 9 reviews were performed from 2004 forward. (*Id*. at 125-126). They were done electronically and forwarded to a trust committee for memorialization. (*Id*.). The Thompsons have not cited any contrary evidence. O'Neill's testimony does not establish that Key Bank failed to "prepare or produce Reg-9's," as the

---

[9]This appears to be a general reference to 12 C.F.R. Part 9, which governs the fiduciary activities of national banks.

Thompsons suggest, particularly in light of his unequivocal agreement that "Reg 9s still [were] conducted from 2004 forward but with much less paper involved[.]" (*Id*. at 126). In any event, if Key Bank performed its last Regulation 9 review in 2004, as the Thompsons appear to believe, we see no reason why Mark and Christie Thompson, as trust beneficiaries with access to all account information, could not and should not have discovered that fact prior to July 2006. Although not specifically raised below, we note too that the Comptroller of the Currency has authority to enforce the provisions of Regulation 9, but no private cause of action exists even if Key Bank did not comply. *Blaney v. Florida Nat'l Bank*, 357 F.2d 27 (5th Cir.1966); *Meyer v. Citizens and Southern Nat. Bank*, 677 F.Supp. 1196, 1202 (M.D.Ga.1988); *In re Corestates Trust Fee Litigation*, 837 F.Supp. 104, 106-107 (E.D.Pa.1993) (finding that no private cause of action may be maintained for a Regulation 9 violation and noting that "private causes of action have arisen only for specific violations of the National Bank Act, not regulations interpreting it"), *aff'd*, 39 F.3d 61 (3d Cir.1994).

{¶ 24} The sixth alleged breach involves "treating Holland more favorably." The basis for this allegation is that, for some period of time, Key Bank failed to charge Holland a trust-administration fee. (Burns depo. at 172; Mark Thompson depo. at 131). We fail to see how not charging Holland a fee could constitute an actionable breach of trust. Mark and Christie Thompson appear to be upset that they were charged administration fees whereas, for some period of time, Holland was not. But insofar as Key Bank failed to charge Holland a fee, the result was more money left in the trust for Mark and Christie Thompson, who at that time were the remainder beneficiaries. Nor can the fact that Key Bank charged Mark and Christie Thompson fees be considered a breach of trust. In his deposition, Mark Thompson admitted

that the trust documents specifically authorize administration fees. (Mark Thompson depo. at 132). In any event, the failure to charge Holland fees would have occurred before her death in 2005 and would have been reflected in the annual statements to which the Thompsons had access. We conclude, therefore, that they knew or should have known about the alleged failure to charge Holland fees before July 2006.

{¶ 25} The seventh alleged breach involves "improperly allocating income and capital gains from the trusts." Without elaboration, which has not been provided to us, we have been unable to determine what this issue concerns—other than possibly Key Bank's failure to offset income and capital gains by selling other investments to generate capital losses, which we already have addressed.

{¶ 26} The eighth alleged breach involves "keeping the C.P. Watson trust open." This issue concerns the timing of Key Bank closing the C.P. Watson Trust, which named Ann Thompson as the beneficiary.[10] Upon Warren Watson's death, the principal of the trust was to go to Ann Thompson and the trust was to be closed. In his deposition, the Thompsons' expert, John Rodgers, opined that Key Bank unjustifiably kept the C.P. Watson Trust open for two years after Warren Watson's death and collected fees during that time. (May 31, 2012 depo. of John Rodgers at 125). Even if we assume, arguendo, that this conduct by Key Bank constituted a breach of trust, Warren Watson died in 1996, which means the C.P. Watson Trust was closed in 1998. As beneficiary of the C.P. Watson Trust, Ann Thompson certainly had access to statements that would have reflected the trust closing two years later and any fees charged during that period. Therefore, she knew or should have known about the delayed

---

[10]The C.P. Watson Trust is separate from the other trusts at issue in this case. It had been created by Warren Watson's father.

closing and the fees sometime in 1998 and long before July 2006.

{¶ 27}   Moreover, our reading of the applicable statute of limitation confirms that Ann Thompson's asserted claim is time barred. R.C.5810.05(C) states:

[A] judicial proceeding by a beneficiary against a trustee for breach of trust must be commenced within four years *after the first of the following* to occur:

(1) The removal, resignation, or death of the trustee;

(2) The termination of the beneficiary's interest in the trust;

(3) The termination of the trust;

(4) The time at which the beneficiary knew or should have known of the breach of trust.

(Emphasis added).

{¶ 28}   The termination of the C.P. Watson Trust was twelve years before filing of the lawsuit. That event occurred before, and regardless of whether, Ann Thompson ever became aware of the alleged late closure of the trust. Accordingly, her claim is time barred by R.C. 5810.05(C)(3) as well.

{¶ 29}   Because the Thompsons filed their breach-of-trust claim more than four years after they knew or should have known the factual basis for each alleged breach, the trial court properly found the claim time barred under R.C. 5810.05(C)(4), and Ann Thompson's claim additionally is barred by R.C. 5810.05(C)(3). The second assignment of error is overruled.

{¶ 30}   The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

FROELICH, J., concurring:

{¶ 31} Evidence of a suspected breach of duty, if it is buried in voluminous documents, laid out in confusing format, utilizing trade jargon and/or requiring a degree in financial economics or accounting to understand, should not usually be deemed "discovered" for starting the running of the statute of limitations (assuming that the discovery rule is applicable).

{¶ 32} However, as the majority explains, the Appellants, at the time they received the trust statements, were admittedly already suspicious of both Holland and the bank such that a reasonable person would be on notice to investigate further and would have, through the exercise of reasonable diligence, discovered a possible cause of action.

. . . . . . . . . .

Copies mailed to:

Michael T. Mann
Michael R. Schmidt
Christopher P. Fisher
Jesse R. Lipcius
Hon. Timothy N. O'Connell